IN THE UNITED STATES DISTRICT COURT
FOR EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED
IN OPEN COURT
NOV - 5 2026
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA.

v.

PATRICK STEVEN YAROCH.

*Defendant.*

Case No. 1:26-CR-208

## STATEMENT OF FACTS

The United States and the defendant, PATRICK STEVEN YAROCH (hereinafter, "YAROCH" or "the defendant"), agree that the facts set forth in the Criminal Information and below are true and accurate. The parties further agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1. From at least in or about December 2024 through at least in or about July 2026, in the Eastern District of Virginia and elsewhere, YAROCH knowingly devised and intended to devise a scheme and artifice to defraud the Federal Bureau of Investigation and previous holders of the cryptocurrency controlled by the credentials stored in the FBI systems and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises. For the purpose of executing the scheme, YAROCH knowingly caused interstate wires to be transmitted, including the wire charged in Count One of the Information.

## THE WIRE FRAUD SCHEME

***Yaroch's Employment and Position***

2. At all times relevant to this Statement of Facts, YAROCH was employed by the Federal Bureau of Investigation (FBI) as a Special Agent.

3. From 2017 through early 2025, YAROCH worked at the FBI Boston Division. While assigned to the FBI Boston Division, YAROCH worked on a national security investigative squad focused on ADVERSARIAL NATION STATE 1.

4. Then, from approximately February 2025 to July 31, 2026, YAROCH was an FBI Supervisory Special Agent who worked at FBI Headquarters' Counterintelligence and Espionage Division. YAROCH occupied a position of significant trust within the FBI.

5. From approximately February 2025 through at least July 31, 2026, YAROCH resided in Northern Virginia, including Ashburn, within the Eastern District of Virginia.

6. At all times relevant to the Statement of Facts, YAROCH possessed a security clearance and had access to classified information, sensitive government programs, and compartmented activities.

7. As an FBI Special Agent, YAROCH owed a duty of honest services to the federal government. He had a duty to conserve and protect government resources. YAROCH was not allowed to steal the confidential cryptocurrency credentials held or obtained by the FBI as part of its investigations. YAROCH was also not allowed to use the credentials stolen from the FBI to transfer the cryptocurrency from the wallets controlled by the credentials to himself. However, YAROCH violated his duty of honest services to the FBI in order to do both of these prohibited actions.

8. YAROCH violated his duty of honest services to the FBI in order to execute his fraud scheme. Specifically, he stole and then misused investigative information – *i.e.*, the cryptocurrency credentials – that he had learned through his employment with the FBI. YAROCH personally profited from this theft of sensitive information, which he used to subsequently steal cryptocurrency from numerous wallets.

***The Scheme and Artifice to Defraud***

9. Beginning no later than in or about December 2024, YAROCH used his government position to cause substantial amounts of cryptocurrency to be transferred from wallets known to the FBI into wallets that he set up and controlled.

10. An object of the scheme and artifice was for YAROCH to maximize his personal wealth and enrichment by misusing his position within the FBI to steal large amounts of cryptocurrency.

11. YAROCH violated his duty of honest services to the FBI in order to execute his fraud scheme. Specifically, he misused information that he learned through his employment with the FBI and profited from his misuse of this sensitive information.

12. The FBI used various systems to collect information related to the agents and analysts' investigative case work and national security intelligence gathering mission.

13. As part of his scheme, YAROCH would search the FBI's systems for information about cryptocurrency, including cryptocurrency credentials of investigative targets that the FBI was monitoring and/or credentials that the FBI was otherwise storing.

14. Specifically, to find cryptocurrency credentials, YAROCH searched the FBI's case management system and a separate FBI system where agents, analysts, and other members of the FBI maintained and shared their investigative data.

15. The cryptocurrency information that was stored within the FBI's case management system was primarily gathered for investigative purposes, which can include classified information. The FBI maintained certain cryptocurrency credentials that were related to investigations. These cryptocurrency credentials were controlled by subjects under investigation, or were credentials established by the FBI for operational purposes, or were credentials controlled by victims of other criminal offenses being investigated by the FBI.

16. YAROCH also searched another FBI system that solely contained classified information that the FBI used solely for purposes of investigating threats of foreign intelligence interest. This system similarly included some cryptocurrency credentials for wallets controlled by a variety of persons, organizations, and adversarial nation states of interest to the United States government.

17. After YAROCH discovered a cryptocurrency credential to control a wallet, he would then transfer the cryptocurrency out of that wallet and into another wallet he solely controlled. Once the stolen cryptocurrency was moved into a wallet under his sole control, YAROCH would typically exchange the stolen cryptocurrency for a different type of cryptocurrency.

18. YAROCH would then conduct additional financial transactions to obfuscate the source, nature, and ownership of the cryptocurrency he had stolen and launder these fraud proceeds.

19. After YAROCH stole the cryptocurrency, he would continue to search the FBI systems about these wallets to ensure that his illicit transfers of the cryptocurrency to wallets under his sole control were not detected.

20. An example of how YAROCH would carry out his scheme is described below:

a. Before YAROCH's wire fraud scheme started, funds were transferred into two cryptocurrency wallets being monitored by the FBI.

b. On December 31, 2024, YAROCH accessed the FBI case management system, and conducted a search. This search led him to a particular FBI criminal case file, which contained reports that detailed the credentials for two different wallets (VICTIM WALLET 1 and VICTIM WALLET 2). On November 5, 2025, YAROCH again accessed the report that contained the credentials for the wallets.

c. On November 6, 2025, [redacted] YAROCH reconstituted VICTIM WALLET 1 and VICTIM WALLET 2 using stolen credentials and fraudulently transferred the funds from these two wallets to his own Bitcoin wallet (YAROCH BITCOIN WALLET 1).

d. As charged in Count One of the Information, YAROCH fraudulently transferred approximately [redacted] or Bitcoin cryptocurrency, [redacted] from VICTIM WALLET 1. YAROCH initiated this transaction on or about November 6, 2025, while he was in the Eastern District of Virginia, and transferred the funds to YAROCH BITCOIN WALLET 1.

e. That same day, YAROCH also initiated another fraudulent transaction of approximately [redacted] BTC, [redacted] from VICTIM WALLET 2 to YAROCH BITCOIN WALLET 1.

f. These transactions caused the wire to travel in interstate commerce as these transactions were processed through a cryptocurrency mining pool headquartered in Beijing, China.

g. From approximately November 7 through November 8, 2025, from YAROCH BITCOIN WALLET 1, YAROCH initiated [redacted] transfers, of approximately [redacted] BTC, [redacted] via a virtual asset swapping service (VIRTUAL ASSET SWAPPING SERVICE).

h. On November 9, 2025, YAROCH transferred some of the fraudulent funds, about [redacted] BTC, [redacted] from YAROCH BITCOIN WALLET 1 to another Bitcoin wallet under his control (YAROCH BITCOIN WALLET 2).

i. From approximately November 9 through November 29, 2025, from YAROCH BITCOIN WALLET 2, YAROCH initiated [redacted] transfers of approximately [redacted] BTC, [redacted] via VIRTUAL ASSET SWAPPING SERVICE.

j. On November 29, 2025, YAROCH also exchanged via VIRTUAL ASSET SWAPPING SERVICE about [redacted] BTC for Sui, [redacted] that was sent to a Sui address under YAROCH's control (YAROCH SUI WALLET).

k. The remaining BTC that YAROCH exchanged via VIRTUAL ASSET SWAPPING SERVICE 1 was then transferred to a Monero wallet. Specifically, from November 7 through November 9, 2025, approximately [redacted] BTC was transferred for XMR, or Monero cryptocurrency, [redacted] These financial transactions that YAROCH initiated, include the financial transaction that was charged in Count Two. These laundering transactions

were executed to conceal the true nature of the BTC, and the fact that it was derived from fraudulent proceeds.

l. YAROCH then exchanged the XMR through other virtual asset service providers and received approximately [redacted] SOL, or Solana cryptocurrency, [redacted] This cryptocurrency was again exchanged via VIRTUAL ASSET SWAPPING SERVICE and transferred to YAROCH SUI WALLET.

m. YAROCH conducted several transactions from YAROCH SUI WALLET to his Kraken wallet during the timeline of the scheme. Following the theft of funds from VICTIM WALLET 1 and VICTIM WALLET 2, between November 25, 2025, and December 22, 2025, there were three transfers into YAROCH's Kraken account that totaled [redacted] These transfers were all funded by YAROCH SUI WALLET.

n. Between November 25, 2025 and January 13, 2026, YAROCH then transferred approximately $93,082 to one of his TD bank accounts. These funds were then transferred between his other TD accounts from which YAROCH sent various payments to cover his debts. Specifically, he paid approximately $30,176 toward his JP Morgan Chase credit cards, approximately $20,000 toward a Pohanka Lexus payment, approximately $18,576 toward a Cubi/Upstart loan, approximately $18,246 toward a Lightstream loan; and $17,500 toward a TD Bank loan.

o. Following the November-December 2025 transfers, additional transfers were made from YAROCH SUI WALLET to YAROCH's Kraken wallet. Between January 2026 and July 2026, six transfers were made totaling [redacted]

[redacted] Following these deposits, approximately $198,050 was transferred from YAROCH's Kraken wallet to his TD Bank account.

21. Throughout the fraud scheme, YAROCH conducted approximately 100 illegal transfers from the cryptocurrency credentials that he found in the FBI systems. YAROCH stole cryptocurrency from at least 79 different wallets. The FBI was monitoring most of these wallets for investigatory purposes due to their being controlled by subjects of various FBI investigations.

22. YAROCH was indiscriminate in the origin and amount of cryptocurrency that he would steal in the fraudulent transfers that he conducted throughout the fraud scheme. YAROCH's thefts ranged from 81 cents in one fraudulent transfer to over $580,000 in another fraudulent transfer. And, similarly, his thefts were wide ranging in who he stole from. Some of these fraudulent transfers were from wallets that were controlled by adversarial nation state actors, including ADVERSARIAL NATION STATE 1 and ADVERSARIAL NATION STATE 2, while most of the rest of YAROCH's fraudulent transfers conducted were from cryptocurrency credentials controlled by subjects of various investigations conducted by the FBI.

23. In addition, YAROCH conducted a fraudulent transfer from at least one wallet that the FBI created to use in an operation. This wallet was funded by cryptocurrency supplied by the FBI.

24. As other examples, YAROCH also conducted at least ten fraudulent transfers from cryptocurrency wallets connected to crime victims. These victims were involved in other FBI investigations, and the FBI maintained their cryptocurrency credentials within the FBI case management system.

25. Throughout his wire fraud scheme, YAROCH conducted approximately 100 fraudulent transfers using credentials related to 35 separate FBI investigations that he discovered

in the FBI systems. YAROCH stole from at least 10 victims. He illicitly gained approximately $2,474,380.66 in fraudulent proceeds from this wire fraud scheme.

**MONEY LAUNDERING TRANSACTIONS**

26. As explained above in Paragraph 20(h)-(l), after YAROCH fraudulently transferred the additional cryptocurrency to himself and conducted additional financial transactions to launder the stolen cryptocurrency. YAROCH designed these transactions to conceal the true nature of the stolen cryptocurrency and include the financial transaction that was charged in Count Two of the Information.

27. Before YAROCH started his fraud and laundering schemes in or around December 2024, he owed a substantial amount of debt for multiple loans and credit cards. Specifically, he took out three loans between April and June 2024, totaling over $100,000, of which the majority remained outstanding as of the end of October 2024. He had also incurred a significant amount of credit card debt, with over $45,000 in balances as of the end of October 2024.

28. YAROCH used the illegal proceeds that he obtained from his fraud and laundering schemes to enrich himself and repay some of these debts, as described in the example given by Paragraph 20.

29. YAROCH intended to use the fraudulent proceeds to make other purchases, including buying a vineyard in Portugal, and financing his life abroad.

30. On May 28, 2026, YAROCH asked ChatGPT, "If I had a million dollars, how would you suggest investing it/spending it to maximize profit and return." ChatGPT responded, "At 37, with a young family, a goal of potentially retiring around 40, and a clear interest in eventually building a slower-living vineyard/agricultural lifestyle in places like Cilento or Portugal's Dão region…"

31. On June 4, 2026, YAROCH asked ChatGPT, "If you had a bucket of money (around $1 million) and you wanted to leave the USA and become a resident or citizen of an EU country, what would you do?" ChatGPT responded, "Given everything you've told me – [name of YAROCH's child], your wife, the desire for a 2-5 hectare estate, interest in age-worthy red wine, and the goal of actually living there rather than just owning a property- I would not start by chasing citizenship…What I would do with $1 million Option 1: Portugal (my top choice for your specific situation)."

32. On or around June 15, 2026, YAROCH provided a power-of-attorney to two lawyers in Portugal "with the power to sub-delegate, the broadest powers permitted by law, as well as special and necessary powers to represent him before the Portuguese Tax and Customs Authority (AT), and to register him and obtain his tax identification number in Portugal, as well as to request and collect, in person, the password to access the finance portal, and to carry out all other acts that they deem necessary to fulfill their mandate."

33. YAROCH made arrangements to travel to Portugal in September 2026. This trip was planned in connection with YAROCH's intended vineyard purchase.

34. YAROCH used a mobile cryptocurrency wallet software called "Slush" on his phone to manage some of his fraud proceeds, but he deleted that application from his phone at some point during the fraud scheme, thereby concealing the existence of the illegal proceeds from his phone. On July 31, 2026, during the execution of a search warrant, YAROCH agreed to allow the FBI agents to redownload the Slush application. YAROCH then directed the FBI to where some of his fraud proceeds were stored. That same day, YAROCH voluntarily signed a consent to seize property form which allowed FBI to transfer money from multiple wallets and cryptocurrency accounts that were controlled by YAROCH.

**CONCLUSION**

35. YAROCH's misuse of the cryptocurrency credentials that he discovered from the FBI systems compromised multiple FBI investigations related to both criminal groups and nation state adversaries, such as ADVERSARIAL NATION STATE 1 and ADVERSARIAL NATION STATE 2. His actions deprived FBI agents, analysts, and other employees of the ability to carry out their functions to protect public safety and national security, including the ability to: (i) follow the potential flow of funds from the relevant wallets to discover other wallets, traditional accounts, and financing and laundering methods by these actors; (ii) disrupt these groups (*e.g.*, lawfully seizing cryptocurrency involved in other offenses); and (iii) potentially restore cryptocurrency to innocent victims. YAROCH's misuse of the cryptocurrency credentials also exposed the FBI's activities to investigative targets who controlled the wallets at issue, as well as other interested investigative targets and foreign adversaries, thereby compromising FBI sources and methods used in foreign intelligence collection and criminal investigations.

36. This Statement of Facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case. Furthermore, this Statement of Facts is an admission of the defendant that can be used in subsequent court proceedings against him.

37. This Statement of Facts does not constitute and is not part of compromise negotiations under Fed. R. Evid. 410 or any other provision of federal law. As such, the defendant agrees that this statement of facts should not be excluded or suppressed under Fed. R. Evid. 410, Fed. R. Crim. P. 11(f), the Sentencing Guidelines or any other provision of the Constitution or federal law.

38. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

TODD W. BLANCHE
Attorney General

THEOPHANI K. STAMOS
First Assistant United States Attorney

Date: October 23, 2026

By: /s/ Kathleen Robeson

Kathleen E. Robeson
Russell L. Carlberg
Assistant United States Attorneys

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, Patrick Steven Yaroch, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

11/02/2026
Patrick Steven Yaroch

I am Kyle Boynton, Esq. defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

11/2/26
Kyle Boynton, Esq.
Attorney for Patrick Steven Yaroch